# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

L.J.F.,[1]

    Plaintiff,

v.                 No. 19-2522-JWB

ANDREW M. SAUL, *Commissioner of Social Security*,

    Defendant.

## MEMORANDUM AND ORDER

Plaintiff filed this action for review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits and supplemental security income. Plaintiff and the Commissioner have each filed a brief. (Docs. 9, 13.) No reply brief was filed and the time for filing one has now expired. The matter is accordingly ripe for decision. For the reasons stated herein, the Commissioner's decision is REVERSED and REMANDED.

**I. Standard of Review**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The Commissioner's decision will be reviewed to determine only whether the decision was supported by substantial evidence and whether the Commissioner applied the correct legal standards. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence as a

---

[1] Plaintiff's initials are used to protect privacy interests.

reasonable mind might accept as adequate to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Although the court is not to reweigh the evidence, the findings of the Commissioner will not be mechanically accepted. Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992). The court should examine the record as a whole, including whatever fairly detracts from the weight of the Commissioner's decision and, on that basis, determine if the substantiality of the evidence test has been met. *Glenn*, 21 F.3d at 984.

The Commissioner has established a five-step sequential evaluation process to determine disability. 20 C.F.R. § 404.1520; *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010). If at any step a finding of disability or non-disability can be made, the Commissioner will not review the claim further. At step one, the agency will find non-disability unless the claimant can show that he or she is not working at a "substantial gainful activity." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). At step two, the agency will find non-disability unless the claimant shows that he or she has a severe impairment. At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled. *Id*. at 750-51. If the claimant's impairment does not meet or equal a listed impairment, the agency determines the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). The RFC assessment is used to evaluate the claim at both step four and step five. 20 C.F.R. § 404.1520(a)(4); § 404.1520(f), (g). At step four, the agency must determine whether the claimant can perform previous work. If a claimant shows that she cannot perform the previous work, the fifth and final step requires the agency to consider vocational factors (the

claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003).

The claimant bears the burden of proof through step four of the analysis. *Blea v. Barnhart*, 466 F.3d 903, 907 (10th Cir. 2006). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy. *Id.*; *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The Commissioner meets this burden if the decision is supported by substantial evidence. *Thompson*, 987 F.2d at 1487.

## II. Background and Procedural History

Plaintiff alleges she was disabled as of January 1, 2013, when she was 21 years old, due to impairments from a seizure disorder. She protectively filed an application for disability insurance benefits and supplemental security income on April 4, 2016. Her application was denied initially by the Commissioner and again upon reconsideration. (Tr. at 123, 129.) Plaintiff then requested an evidentiary hearing before an Administrative Law Judge (ALJ). An evidentiary hearing was held in Kansas City, Missouri, on May 1, 2018, before ALJ Scott Johnson. Plaintiff testified at the hearing, as did Plaintiff's mother, as well as vocational expert Holly Berquist Neal. (*Id.* at 35.) The ALJ issued a written decision on August 24, 2018, denying Plaintiff's application for benefits. (*Id.* at 13.)

Plaintiff was 27 years old at the time of the evidentiary hearing. She had one year of college education. She reported prior employment as a cashier, cook, home caregiver, telemarketer, sales associate, restaurant hostess, and mail handler. (Tr. at 21.) Plaintiff initially alleged an onset disability date in 1998, but at the evidentiary hearing she amended the alleged onset date to January 1, 2013. (*Id.* at 39-40.) The ALJ found Plaintiff had developed an epileptiform seizure disorder

3

at age seven or eight, for which she had been prescribed anti-epileptics, including Keppra. (*Id.*) Diagnostic testing, including magnetic resonance imaging (MRI) scans, indicated right temporal lobe localization. (*Id.*) Plaintiff was admitted to a hospital in January of 2015 to undergo a video electroencephalogram with inducement of seizures in order to classify her seizure disorder. The examination confirmed the presence of a seizure disorder, with Plaintiff suffering three convulsive seizures as her medication was reduced. (*Id.* at 438.) Plaintiff presented evidence in support of her claim that she is disabled as a result of her seizure disorder, including that she experiences seizures diagnosed as "tonic-clonic" in nature on a monthly or even weekly basis despite taking anti-seizure medication.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity after the alleged onset date.[2] (*Id.* at 18.) At step two, the ALJ found Plaintiff suffered from the following severe impairments: seizures and obesity. (*Id.* at 19.) At step three, the ALJ determined that Plaintiff does not have an impairment that meets or medically equals the severity of an impairment listed in the regulations. *See* 20 C.F.R., Pt. 404, Subpt. P, App.1 (Listing of Impairments). The ALJ noted that Plaintiff alleged she was experiencing seizures once or twice a week despite using her medication and said she suffered migraine headaches prior to the seizures. (*Id.* at 21.) Plaintiff said she was suffering migraine headaches every other day. (*Id.*) Plaintiff said her seizures were brought on by stress and manifested as one to two minutes of shaking, during which Plaintiff may bite her tongue and lose consciousness, accompanied by memory loss. Plaintiff said her prior employers would not let her continue to miss days of work due to her illnesses. (*Id.*) The ALJ found that Plaintiff's medically determinable impairments, including her

---

[2] The ALJ noted there was some evidence that Plaintiff may have engaged in substantial gainful activity after the alleged onset date. (Tr. at 18.) But because there was a sufficient period in which Plaintiff had not engaged in such activity, such that the ALJ would have to proceed with the sequential evaluation in any event, the ALJ made the above finding and proceeded with the evaluation. (*Id.*)

seizure disorder, could be expected to cause symptoms of the nature alleged, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence of record. (*Id.*)  The ALJ found Plaintiff's seizure disorder did not satisfy the criteria of Listing 11.02 for Epilepsy. (*Id.* at 19.)

The ALJ next determined that Plaintiff had the RFC to perform a range of work at all exertional levels.  The ALJ found Plaintiff can never climb ladders, ropes, or scaffolds; can tolerate occasional exposure to extreme cold and heat; she needs to avoid all hazards, including the use of knives, moving machinery, and exposure to unprotected heights; she is precluded from driving an automobile as part of the job and needs to avoid exposure to open flames or open bodies of water. (Tr. at 20.)

After formulating the RFC, the ALJ determined at step four that Plaintiff could perform her past relevant work as a home attendant, as a cashier, and as an order picker. (*Id.* at 25.)  The ALJ cited the testimony of the vocational expert in support of a finding that Plaintiff is capable of performing these jobs as they are generally performed in the economy and as Plaintiff actually performed them. (*Id.* at 25-26.)  The ALJ thus concluded Plaintiff was not disabled within the meaning of the Social Security Act.  The ALJ went on to find, in the alternative, that Plaintiff was not disabled at step five of the sequential analysis because there were other jobs existing in the national economy that Plaintiff is also able to perform, including marking clerk, mail clerk, and cafeteria attendant. (*Id.* at 27.)

**III. Analysis**

    A. Listing 11.02

Plaintiff argues the ALJ erred by finding that Plaintiff's seizure disorder did not meet Listing 11.02 (Epilepsy). (Doc. 9 at 13.)[3] Plaintiff argues she met Listing 11.02 through evidence of "a significant and regular history of tonic-clonic seizures, witnessed by several persons, including medical professionals…." (*Id.* at 14.) Plaintiff challenges the ALJ's finding that she did not meet the listing, asserting that the "record compels a contrary conclusion, as it is impossible to find that the ALJ's alternative explanation of the facts is reasonable…." (*Id.* at 15.) Plaintiff also argues that the ALJ failed to articulate his findings at this step in a sufficiently clear way to permit informed review. (*Id.* at 17.)

The "Listing of Impairments" describes certain impairments the Commissioner considers disabling. 20 C.F.R. § 404.1525. If a claimant's condition "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). The claimant bears the burden of demonstrating, through medical evidence in the record, that her impairments meet the specified criteria. *Riddle v. Halter*, 10 F. App'x. 665, 667 (10th Cir. 2001) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). The impairment must meet all of the listing criteria to qualify. *Zebley*, 493 U.S. at 530. *See A.W. v. Saul*, No. 19-2271-JWB, 2020 WL 3288080, at *3 (D. Kan. June 18, 2020).

Epilepsy is a pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain. Listing 11.00H1. Listing 11.02 is met if there is a documented, detailed description of a typical seizure characterized by any of several circumstances, one of which is "[g]eneralized tonic-clonic seizures…, occurring at least once a

---

[3] Plaintiff's brief also cites, but does not discuss, Listing 12.00 relating to mental disorders. (Doc. 9 at 13.) The Commissioner evaluates impairments from epilepsy as a neurological disorder (Listing 11.00) but related or co-occurring mental impairments are evaluated under the listings pertaining to mental disorders (Listing 12.00). Psychogenic and pseudoseizures are evaluated by the Commissioner under the listing for mental disorders. Listing 11.00H1. Plaintiff's brief does not argue that she met any of the listings for mental disorders.

6

month for three consecutive months… despite adherence to prescribed treatment." Listing 11.02A. Generalized tonic-clonic seizures "are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions.)" Listing 11.00H1a.  "Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." *Id.*  With respect to counting seizures, "[t]he required number of seizures must occur within the period [the Commissioner] is considering," and the Commissioner will "consider your adherence to prescribed treatment…." Listing 11.00H4. The Commissioner does "not count seizures that occur during a period when you are not adhering to prescribed treatment without good reason."  Listing 11.00H4d.

The ALJ found at step three that Plaintiff did not meet the requirements of Listing 11.02. (Tr. at 19.)  But the ALJ did so in conclusory fashion, without clearly explaining why Plaintiff did not meet the requirements.  After examining the ALJ's opinion in light of the record presented, the court concludes that a remand is required for the ALJ to make clear findings with respect to Listing 11.02.  The ALJ found as follows:

> The claimant's seizure disorder does not satisfy the criteria of Listing 11.02 for Epilepsy because the record does not document the claimant experiencing generalized tonic-clinic [sic] seizures occurring at least once a month for at least three consecutive months or occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment, or dyscognitive seizures occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment.

(Tr. at 19.)

This finding does nothing more than restate the language of Listing 11.02.  The ALJ's opinion indicated that his finding was explained by "the medical evidence discussed herein," but the subsequent discussion does not clarify whether he concluded the listing was not met because

7

Plaintiff's seizures were not tonic-clonic in nature, because Plaintiff failed to show she had one seizure a month for three consecutive months, because Plaintiff failed to show her seizures occurred while she was taking her anti-seizure medication, or perhaps for some other reason. The ALJ's opinion fails to state clearly how the evidence – which was conflicting in some respects as to seizure frequency and medication compliance – showed the listing was not met. *Cf. Fischer-Ross v. Barnhart,* 431 F.3d 729, 733-34 (10th Cir. 2005) (lack of findings at step three harmless if ALJ's analysis otherwise contains a sufficient explanation of findings to permit meaningful review).

Instead, the ALJ discussed generally how some of Plaintiff's allegations "are not fully consistent with or supported by the medical evidence." (*Id.* at 22.) For example, while acknowledging Plaintiff's longstanding seizure disorder, the ALJ pointed out that Plaintiff "has not sought any emergent care for a seizure since the alleged onset date" and stated that "no worsening in the condition is documented" around the onset date. (*Id.*) Seeking emergency room care for a seizure, however, is not essential to meeting Listing 11.02A. Because the ALJ did not explain the significance of these findings, it is unclear what point the AJL was making by citing a lack of emergency room treatment or the worsening of the condition. It may have been to question the frequency of Plaintiff's seizures or perhaps the severity or disabling nature of them. If it was the latter, such evidence was not probative as to Listing 11.02, which can be satisfied regardless of whether seizures require emergency room treatment or have recently worsened.

The ALJ also stated elsewhere in his opinion that Plaintiff sought emergency room treatment for a seizure in October 2012 and additionally reported experiencing a seizure "the day prior to seeking treatment for chest pain on February 19, 2018," but the ALJ concluded Plaintiff "was noncompliant with her prescribed medication regimen at both times." (*Id.*) While the record

8

of the October 2012 incident clearly reflects that Plaintiff missed a dose of her medication a few days before that seizure[4] (Tr. at 418-21), there is no such indication in the February 2018 report, which is silent with respect to medication compliance.  The ALJ apparently inferred that Plaintiff was not compliant on the latter date because a section of the emergency room report entitled "Current Medications" listed only ibuprofen.  But it is not clear from the report itself why ibuprofen was listed or why Plaintiff's anti-epilepsy drugs were not listed.[5]  Inferring from this absence alone that Plaintiff not only failed to report her prescribed anti-seizure medications during her emergency room visit but also that she had not taken her medication prior to the seizure requires multiple inferential leaps.  Only by resorting to speculation can one conclude this report demonstrates that Plaintiff was not taking her anti-epilepsy medicine prior to the February 19, 2018, seizure.

The most notable gap in the ALJ's findings concerning Listing 11.02, however, concerns the opinions of Dr. Patrick Landazuri, a seizure specialist who treated Plaintiff at the Epilepsy Clinic at KU Medical Center.  The ALJ gave great weight to this doctor's opinions imposing certain restrictions on Plaintiff (such as prohibiting her from driving a car) and noted Landazuri's "substantial treating relationship" with Plaintiff.  (Tr. at 24.) In one part of his opinion, the ALJ further pointed to Plaintiff's initial evaluation by Landazuri on April 26, 2016, at which Plaintiff reported that she "only has seizures if she doesn't take her medications." (Tr. at 487.)   But the ALJ did not address or reconcile subsequent findings to the contrary in Landazuri's records, such

---

[4] The emergency room report indicated that Plaintiff "reports she is taking her seizure meds but missed 1 dose a few nights ago."  (Tr. at 418.)  The report also indicated that Plaintiff's mother was concerned that Plaintiff has had an increased frequency of seizures for 4-5 days.  (*Id.*)

[5] The listing of one dose of 800 mg of ibuprofen in the "Current Medications" section of the report appears to refer to medication Plaintiff was given at the emergency room.  (*See* Tr. at 613.)  A different report from the same hospital reflects a July 27, 2016, visit from Plaintiff after she was hit in the head by a falling box.  Although Plaintiff reported on that occasion she "has taken 400 mg of ibuprofen without any relief of pain," the "Current Medications" section of the report lists only a dose of Tylenol that Plaintiff was given at the emergency room.  (Tr. at 596.)

9

as an April 21, 2017, examination at which Landazuri stated that since Plaintiff's last visit on January 1, 2017, Plaintiff "continues to have seizures" and "estimates 1-3 seizures per month." (Tr. at 733.) Landazuri counseled her at that point on "her drug resistant epilepsy" and possible surgical treatment. (Tr. at 735.) Landazuri noted Plaintiff was open to the idea of surgery and indicated he would present her case at the clinic's surgical epilepsy conference to discuss her as a candidate for surgery or invasive monitoring. (*Id.*) At a conference on April 25, 2017, Dr. Landazuri and three other doctors agreed to recommend that Plaintiff have a PET [positron emission tomography] brain scan and invasive depth probe monitoring. (*Id.* at 752.)

At a follow-up visit about a month later, on May 18, 2017, Plaintiff stated "she has had [a seizure] since she was last seen, but no hosp[ital]/[emergency room] visit" and that she "wants new refills on her meds today." (*Id.* at 757.) Landazuri diagnosed Plaintiff with "Pharmacoresistant partial epilepsy with impairment of consciousness, intractable (HCC) [G40.219]." (*Id.*) The ALJ did not address this doctor's diagnosis of intractable drug-resistant epilepsy, although the diagnosis was consistent with Plaintiff's testimony that she experienced continuing seizures in this period despite taking her medications. Nor did the ALJ address the significance of a team of specialists having recommended invasive monitoring as a prerequisite to possible surgical treatment – although this could be an indication that Plaintiff's treating doctors believed Plaintiff's seizures could not be controlled by medication. Landazuri subsequently referred Plaintiff to a neurosurgeon for invasive depth probe monitoring. (*Id.*) The record shows that Dr. Landazuri renewed Plaintiff's anti-epileptic drug prescriptions in October and November of 2017, and at other times as well. (Tr. at 779-82.) In a follow-up visit on November 21, 2017, he noted that Plaintiff "continues to have seizures on a monthly basis." (*Id.* at 787.) Plaintiff underwent a PET scan on May 18, 2018. (*Id.* at 754.) The results indicated that the "seizure foci"

10

involved Plaintiff's right temporal lobe. "Diminished uptake" within the cerebellum was characterized as "secondary to chronic antiseizure medication use." (*Id.*) As the ALJ noted, Plaintiff did not undergo the recommended invasive depth probe monitoring; at the hearing she indicated she was afraid of the procedure.[6]

In denying an application for disability benefits, the Commissioner must issue a decision "in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based." 42 U.S.C. § 405(b)(1). *See also Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996) ("Under this statute, the ALJ was required to discuss the evidence and explain why he found that appellant was not disabled at step three.") In this instance, the ALJ's opinion does not disclose the basis on which Plaintiff's evidence relating to Listing 11.02 was found to be insufficient. The court cannot discern from the opinion what particular element or elements of Listing 11.02 were found lacking. The ALJ indicated at one point that Plaintiff's testimony that she was having seizures on a weekly basis was not supported, noting Plaintiff had previously "reported them to occur approximately monthly…." (Tr. at 22.) Of course, if the seizures occurred monthly despite Plaintiff taking her medication, that might be sufficient to meet Listing 11.02. After making the foregoing observation, the ALJ went on to express doubt as to whether Plaintiff experienced seizures on a monthly basis, commenting that "even that frequency [once a month] is uncorroborated by the objective medical evidence." (*Id.*) But in doing so the ALJ made no particular findings concerning frequency and

---

[6] The ALJ noted Plaintiff had not undergone the recommended procedure, although it is not clear whether this observation played any part in the ALJ's conclusion that Plaintiff did not meet the requirements of Listing 11.02. (*See* Tr. at 22.) The requirement in Listing 11.02 of having continuing seizures "'despite adherence to prescribed treatment'" means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment." Listing 11.00C. The Commissioner is required to consider whether a person has good reason for not following prescribed treatment. *See* Listing 11.00 H4d; 20 C.F.R. 404.1530 (acceptable reasons for failure to follow prescribed treatment include where the treatment, because of its magnitude or unusual nature, is very risky.)

failed to mention or discuss a significant part of the relevant medical evidence – namely, Dr. Landazuri's findings and opinions about Plaintiff's continuing seizures and his diagnosis of drug-resistant epilepsy.  (*Id.*)  The ALJ also stated that evidence of Plaintiff's continuing seizures was "consistent with [her]… April 26, 2016 statement … that she only experiences seizures at times of medication noncompliance."  (*Id.*)  But again, the ALJ made no particular finding about treatment noncompliance and apparently did not consider or weigh the diagnosis of Dr. Landazuri that Plaintiff's epilepsy was of an intractable, drug-resistant nature.

The absence of clear findings and an explanation of how Plaintiff failed to satisfy the requirements of Listing 11.02 leaves the court uncertain of the basis of the ALJ's ruling.  The ALJ is not required to discuss every piece of evidence in the record. *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009).  But the ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Mays v. Colvin,* 739 F.3d 569, 576 (10th Cir. 2014).  Dr. Landazuri's treatment and diagnosis of Plaintiff's seizures constitutes significant probative evidence that the ALJ did not sufficiently consider or address in determining that Plaintiff's epilepsy did not meet Listing 11.02.

The court concludes the proper course is to remand so the ALJ may address the elements and evidence pertaining to Listing 11.02.  Upon remand, the ALJ is free to reopen the hearing if necessary.  In view of this finding, the court does not address Plaintiff's additional claims of error, as those issues may be rendered moot by the ALJ's consideration of the case upon remand.  The court rejects Plaintiff's argument that the case should be remanded for an award of benefits.  (Doc. 9 at 29.)  The evidence in the record concerning the frequency of Plaintiff's seizures and her compliance with medication is conflicting.  A remand is required so that the ALJ properly

considers all of the conflicting evidence in making a determination of disability.  Nothing in this opinion is intended to suggest any particular outcome with respect to Plaintiff's application.

**IV.  Conclusion**

The Commissioner's decision is REVERSED and REMANDED. The case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings in accordance with this Memorandum and Order.

The clerk is directed to enter judgment in accordance with this order.  IT IS SO ORDERED this 27th day of August, 2020.

                                            \_\_\_\_\_s/ John W. Broomes_____
                                            JOHN W. BROOMES
                                            UNITED STATES DISTRICT JUDGE